519 So.2d 1292 (1987)
Joe M. O'GRADY, et al.
v.
CITY OF HOOVER, Alabama.
86-1243.
Supreme Court of Alabama.
December 31, 1987.
Rehearing Denied February 12, 1988.
*1294 William L. McElroy, Birmingham, for appellants.
Jack H. Harrison of Gordon, Harrison & Latham and Charles Hayes of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, for appellee.
John P. Adams, of Bradley, Arant, Rose & White, Birmingham, for amicus curiae Alabama League of Municipalities.
William M. Slaughter, Mark E. Ezell, and James L. Richey of Haskell, Slaughter & Young Professional Ass'n, Birmingham, and Robert E. Steiner III of Steiner, Crum & Baker, Montgomery, for amici curiae Alabama Bankers Ass'n and Alabama Security Dealers Ass'n.
Joseph H. Johnson, Jr., and David W. Spurlock of Johnson & Thorington and J. Hobson Presley, Jr., of Maynard, Cooper, Frierson & Gale, Birmingham, for amicus curiae Ass'n of County Commissions of Alabama.
SHORES, Justice.
This is an appeal from a judgment entered in a statutory validation proceeding initiated by the City of Hoover, Alabama (the "City"), pursuant to the provisions of Ala.Code (1975), §§ 6-6-750 et seq., to validate general obligation warrants in the principal amount of $12,150,000. The petition was filed against the taxpayers and citizens of the City, and an answer was filed by the district attorney. Joe M. O'Grady and Daniel R. Farnell also responded by filing an answer entitled "Showing of Cause." Pursuant to an order of the trial court, O'Grady and Farnell were named intervenors and parties defendant in the validation proceeding.
The validation hearing was held before the Honorable Marvin Cherner in the Circuit Court of Jefferson County on May 7 and 8, 1987. After receiving briefs from attorneys for both sides, the trial court rendered its "Findings of Fact, Conclusions of Law and Final Judgment," in which it validated and confirmed the warrants and all agreements and proceedings initiated by the City. The district attorney participated in the proceedings below, but did not join the appellants in this appeal.
The underlying facts are undisputed. On April 6, 1987, the elected officials of the City of Hoover adopted Ordinance No. 87-602 authorizing the issuance of general obligation warrants in the principal amount of $12,150,000. These funds were to be donated to the Public Park and Recreation Board of the City of Hoover (the "Park Board") and were to be used by the Park Board for the acquisition and construction of a public park, athletic field and stadium, and related improvements. The Park Board is a public corporation, and, as the owner of the stadium, it entered into a lease agreement permitting the Birmingham Baseball Club, Inc. (the "Barons"), to use the stadium for playing baseball during the minor league baseball season for ten years with an option to renew the lease for an additional five-year period.
Additionally, the Park Board and the Barons have entered into a management agreement for the stadium to be utilized for other recreational, charitable, and civic events. Under this agreement, the Barons will have sole use of the stadium for the management and conducting of events other than the playing of professional baseball. The lease and the management agreement were executed contemporaneously, and when read together provide for a year-round lease with a duration of ten years with an option to renew for an additional five-year period.
The trial court made the following pertinent findings of fact:
"11. The Warrants will be issued to provide funds for the acquisition and construction of public park and recreational facilities, specifically a public park, athletic field and stadium and related improvements (the `Project') to be owned by The Public Park and Recreation Board of the City of Hoover.... The Board will acquire and construct the Project in the City with the funds provided by the City.
"...
"13. The Board will own the Project and will lease the same to Birmingham Baseball Club ... to play baseball during *1295 baseball season pursuant to a lease agreement ... between the Board and the Baseball Club.
"14. The Board will own the Project and will operate the same for other public events pursuant to a management agreement ... between the Board and the Baseball Club ...
"...
"17. There is sufficient evidence to support the findings and determinations of the Governing Body contained in the Authorizing Ordinance. There is no evidence of fraud, collusion or unfair dealing in connection with any of the aforesaid documents or proceedings. Neither the size of the stadium nor any other evidence offered establishes any abuse of discretion by the elected officials in carrying out their duties."
From these findings, the trial court reached the following conclusions of law:
"1. All actions and things required under the provisions of the Validation Act to be had and done in this proceeding preliminary to the making of the findings of fact, conclusions of law and judgment of this Court herein contained, have been had and done in the manner provided by the Validation Act. The City and the Governing Body have power to institute and conduct this proceeding and have duly authorized the same.
"...
"8. Although the answers filed raise the question as to whether the proceedings authorizing the issuance of the Warrants were properly adopted, at the hearing the District Attorney and, with less enthusiasm, counsel for the named intervenors, conceded their proper adoption, but argued that the Warrants should not be validated because (a) their issuance would be in violation of Section 222 of the Alabama Constitution as no election had been held authorizing their issuance and (b) the proposed use of the proceeds of the Warrants would be in violation of Section 94 of the Alabama Constitution as amended by Amendment No. 112. The Court has carefully reviewed the cases cited by counsel for the named intervenors and notes that no case was cited in which debt instruments designated `warrants' and bearing the indices thereof have been held to be in fact `bonds' within the meaning of Section 222 of the Constitution. On the contrary, in Parsons v. City of Birmingham, 223 Ala. 610, 137 So. 665 (1931), the Alabama Supreme Court found that the debt obligation in question (a promissory note under seal) would be a bond `as legally defined' but held that no election was required to authorize its issuance. In Parsons, the Court stated:
"`It certainly cannot be affirmed that the purpose of the Constitution was to prohibit the creation of city indebtedness without an election. There is nothing in the Constitution to prohibit the creation of debts to the limit which it fixes, without the sanction of such election. The Constitution, § 222, only checks the issuance of a certain form of security for that debt, but not the creation of the debt. It has been held not to prohibit the issuance of warrants, under seal, though interest bearing and due over a period of years.' Citing Littlejohn v. Littlejohn, 195 Ala. 614, 71 So. 448.
"The Warrants are similar to those discussed in the leading decision in this area, Littlejohn v. Littlejohn, supra. Here, as in Littlejohn, the debt obligations are warrants and do create an indebtedness chargeable against the applicable constitutional debt limit, but they may be issued without an election.
"Counsel for the named intervenors has cited several cases in which instruments which were bonds were held by the Alabama Supreme Court not to create a debt under the applicable constitutional provisions because they were payable solely from the revenues of a specified municipal enterprise, such as a water system. The Alabama Supreme Court further held that such bonds were not `bonds' within the meaning of Section 222 requiring an election prior to their issuance. For example, see Opinion of the Justices, 252 Ala. 583, 42 So.2d 348 (1949). However, it does not follow that *1296 under Alabama case law and statutes all debt instruments which are not limited in payment to revenues from a specific municipal enterprise, but are payable from general taxes and revenues of the municipality, thereby become `bonds' and subject to an election prior to their issuance. The statement of the Alabama Supreme Court in Parsons noted above clearly negates this argument and sets forth applicable Alabama law on the point. It is consistent with, and a continuation of, the principles applied by the Court to `warrants' in Littlejohn.

"As the Court further noted in Parsons, `In ascertaining the meaning of constitutional and statutory terms, we should construe them in light of accepted and well known trade customs.' As early as Littlejohn, the Court was able to state that the distinction between warrants and bonds was well established. That distinction does not turn upon whether debt is created or whether the source of payment is limited to the revenue from a specified enterprise or tax. As evidenced by the action of the Alabama Legislature in 1986 permitting warrants and other non-bond evidences of indebtedness to be payable over a period of up to thirty years, the distinction continues settled in Alabama law. See Act No. 86-712, Acts of Alabama, 1986 Extraordinary Session of the Alabama Legislature.
"9. The Warrants and the provisions thereof and the Authorizing Ordinance proposed to be validated do not violate the provisions of Section 93 or Section 94 of the Constitution....
"The Alabama Supreme Court has repeatedly held Section 93 is applicable only to the State ... and that there can be no violation of Section 93 or Section 94 by the donation of state or municipal funds or properties to a public corporation as is proposed to be done with the proceeds of the Warrants. [Citations omitted.] The subsequent exercise by such public corporation of its statutory powers with respect to the leasing and management of properties so acquired, as here proposed, [does] not change the foregoing conclusion.
"...
"12. The use of the proceeds of the Warrants as contemplated by the Authorizing Ordinance is authorized under Alabama law. The City is expressly authorized to provide funds for the acquisition and construction of a public park, athletic field and stadium (the `Project') which would be owned by The Public Park and Recreation Board of the City of Hoover (the `Board'). The Board is expressly authorized to acquire and construct the Project.
"...
"14. The Board is expressly authorized to own the Project and to lease the same in the manner in which it has done so to Birmingham Baseball Club ... to play baseball during baseball season pursuant to a lease agreement ... between the Board and the Baseball Club. No election is required for the approval and execution of the Lease Agreement.
"15. The Board is expressly authorized to operate the Project for other public events in the manner in which it proposes to do so pursuant to a management agreement ... between the Board and the Baseball Club.
"...
"17. The approval and/or execution by the City and the Board of the Lease Agreement, the Management Agreement... were in every respect proper, legal, within the power of the City and the Board to approve and/or execute, were not arbitrary or capricious, do not constitute a gross and palpable abuse of discretion, do not constitute unjust enrichment of the Baseball Club ... and do not impose an inequitable and unconscionable burden on the taxpayers and citizens of the City."
Pursuant to these conclusions, the trial court entered an order validating and confirming the warrants and the proceedings, provisions, covenants, and agreements in connection therewith. The appellants assert that the trial court erred in finding that the proposed general obligation warrants *1297 were not "bonds" and were not subject to the provisions of § 222 of the Constitution of Alabama. Also, the appellants contend that the transactions violate § 94 of the Constitution of Alabama, and that an election was required prior to the execution of the lease between the Park Board and the Barons. We affirm the judgment of the trial court.
Section 222 of the Constitution of Alabama provides that no bonds shall be issued under the authority of a general law unless such issue of bonds be first authorized by a majority vote by ballot of the qualified voters. For more than 80 years, this Court has consistently held that § 222 is not applicable to interest-bearing warrants. See Matkin v. Marengo County, 137 Ala. 155, 34 So. 171 (1903); Talley v. Comm'rs' Court of Jackson County, 175 Ala. 644, 39 So. 167 (1905); Littlejohn v. Littlejohn, 195 Ala. 614, 71 So. 448 (1916); Parsons v. City of Birmingham, 223 Ala. 610, 137 So. 665 (1931).
This statement of law is not contested. However, it is the appellants' contention that the instruments proposed to be offered by the City, although labeled "General Obligation Warrants," are, in reality, by the terms and conditions of the sale, bonds, and, for this reason, are subject to the provisions of § 222. Although bonds and warrants are mutually exclusive in that one instrument cannot be both a bond and a warrant, these two instruments do not encompass the entire field of negotiable or commercial instruments. If an instrument fails to meet the criteria of a warrant, it is not automatically a bond, and vice versa. The instrument may be a promissory note, a check, a draft, or one of a number of other instruments. Therefore, we focus our attention on the characteristics of bonds and will apply our analysis to the proposed instruments in order to properly determine whether they are bonds, since only bonds are subject to the restrictions of § 222 of the Constitution of Alabama.
We begin our analysis by applying the factors as set forth in Littlejohn to the proposed instruments in the instant case. The following excerpt from Littlejohn, supra, 195 Ala. at 617, 71 So. at 449, illustrates the basic distinction between a bond and a warrant:
"It must be regarded as settled that the issuance by the authority of a commissioners' court of interest-bearing warrants on the county treasurer, payable at stated times in the future, to pay for public buildings, public roads and bridges, is not the issuance of bonds by the county within the provisions of section 222 of the Constitution; and that commissioners' courts are competent, unless restrained by the debt limit fixed in Section 224 of the Constitution [citations omitted], to issue interest-bearing warrants of the character above described [citations omitted].
"A county warrant `is the command of one duly authorized officer to another, whose duty it is to obey, to pay, from county funds, a specified sum to a designated person whose claim therefor has been allowed by the court of county commissioners.' [Citations omitted.] Such a warrant has not the attributes of commercial paper, and is not assignable, so as to be made the foundation of an action at the suit of a transferee. [Citations omitted.]
"As employed in section 222 of the Constitution, the term `bond' signifies an obligation in writing to pay a sum of money. It imports, necessarily, a promise to pay a certain sum of money at a future date, and commonly bears no specific designation of the person or entity in whose favor its promise runs. Bonds authoritatively issued by agencies of the governments are commercial paper and are capable of assignment and of transfer, and the succeeding owner may of course found an action upon it. [Citations omitted.] There is, hence, a marked fundamental difference between county warrants and the county bonds to which section 222 of the organic law makes governing reference. The fact that both county warrants and county bonds may be made presentable and payable at a future specified date, and that they bear interest for prescribed periods does not suffice to eliminate the stated *1298 characteristic distinctions between them. One, the warrant is an order to pay when in funds; while the other, the bond, is a promise to pay."
A thorough reading of the provisions of Ordinance No. 87-602 reveals that the proposed instruments are very different from the warrants at issue in Littlejohn. In general, a warrant is an order or direction to pay when in funds, while a bond is considered a promise to pay that is enforceable without being conditioned upon the obligor's being in funds. The appellants agree with this distinction; however, it is their position that the instruments in the instant case do not comport with this distinction. It is indisputable that the proposed warrants contain the classic language acknowledging a debt and ordering the treasurer to pay the payee. However, the language of the subsequent clauses makes the instruments more than a mere direction to pay when in funds.
The express language of the ordinance provides that the City "[H]ereby acknowledges itself indebted to ... and hereby orders and directs the Treasurer of the Municipality to pay to said payee...." The City is to maintain a fund at a depository bank, and the City "has obligated itself to pay or cause to be paid into said fund from the taxes, revenues or funds of the [City] sums sufficient to provide for the payment of the principal of and interest on the Warrants as the same mature and come due." In addition, the ordinance provides:
"It is hereby recited, certified and declared that the indebtedness evidenced and ordered paid by this warrant is lawfully due without condition, abatement or offset of any description. If on any principal or interest payment date the balance in the warrant fund is insufficient to pay the principal of and interest on the warrants due and payable on such date, the Municipality shall forthwith pay any such deficiency into the warrant fund. The depository shall sell and reduce to cash a sufficient portion of [the investments of the warrant fund] whenever the cash balance in the warrant fund is insufficient to pay the interest and principal requirements on the Warrants."
It is the City's contention that the proposed instruments cannot be bonds since they contain no express language whereby the City "agrees" or "promises," in so many words, to pay any stated sum to the registered owners. There should not be any significance given to the fact that the proposed instruments do not contain an express "promise." Section 11-1-17, Ala. Code (1975), contains a statutorily approved form for a warrant, and that form contains an express "promise to pay." In other words, the nature of the instrument is determined from the language as a whole and is not dependent upon the inclusion or exclusion of one particular word.
The express language of the ordinance constitutes more than a mere "order to pay when in funds" and is very similar to the traditional "promise to pay" language used in bonds.
Another essential characteristic of a "bond" is the nature or kind of contractual obligation inherent in and represented by a "bond"that is, a promise or obligation to pay money; "warrants" do not have this feature. They key remedy available to a bondholderi.e., the power to sue on the contract represented by the issuer's promise to payis not available to the holder or transferee of a warrant. A warrant "possesses no element of a contract." Savage v. Mathews, 98 Ala. 535, 13 So. 328 (1892). Mandamus is the appropriate remedy against the treasurer forcing him to apply to the payment of a warrant "funds actually in hand which he ought to apply as payment." Through mandamus, a court may compel a treasurer to carry out his official duty.
Section 16 of the ordinance expressly provides that "The terms, provisions and conditions set forth in this ordinance constitute a contract between the [city] and the registered owners of the Warrants and shall remain in effect until the principal of and interest on the Warrants shall have been paid in full." In addition, Section 13 of the ordinance provides that the City "will pay ... all expenses incident to the *1299 collection of any unpaid portion thereof, including a reasonable attorneys' fee."
These provisions are contrary to the proposition that a warrant holder's exclusive remedy is mandamus. At oral argument, the City conceded that a warrant holder's remedy is mandamus, as established by law. However, the express provisions of the ordinance provide that the agreement constitutes a contract, thus allowing a holder to maintain an action in contract, just as a bondholder brings his action in contract.
From the foregoing, it is evident that the proposed instruments are not warrants within the contemplation of Littlejohn. However, this does not necessarily mean that the instruments are bonds and that the issuance without an election was in violation of § 222. As stated at the beginning of our analysis, the issue before us is whether the proposed instruments are bonds, not whether the proposed instruments are warrants.
Although a warrant is assignable, the transferee cannot be a holder in due course and the transferee will be subject to all the defenses of the obligor. Also, a warrant does not have the attributes of a negotiable instrument, in that it cannot be made the foundation of an action at the suit of a transferee. On the other hand, a distinguishing feature of a bond is that it is freely transferable, and the transferee can acquire holder-in-due course status.
Bonds, within the scope of § 222, must be negotiable instruments, and the statutory provisions for negotiable instruments, § 7-3-104(1)(d), Ala.Code (1975), require that a negotiable instrument be payable to order or to bearer. In this context, the requirement that it be payable to order or to bearer contemplates that the payee will be able to directly assign the instrument to the transferee without the necessity of involving the original obligor. Although the proposed instruments in the instant case are freely transferable and assignable, this may be accomplished only on the books of the depository and only upon surrender of the warrant to the depository for cancellation. Upon the tender of the warrant, a new warrant of like tenor shall be issued to the transferee in exchange therefor. This destroys the negotiability of the instruments, and all subsequent transferees will be subject to the defenses of the City. Since the instruments in the instant case require any transfer to be accomplished through the City, the proposed instruments cannot be bonds. Therefore, the proposed instruments are not subject to the constitutional provisions of § 222.
We are not informed why the framers of the Constitution included only bonds, and not other negotiable instruments, within the provisions of § 222, but it only applies to bonds, and our function is to apply the constitutional provision as enacted and to determine whether these instruments are bonds. We cannot, by judicial interpretation, amend § 222 of the Constitution to make it applicable not only to bonds, but also to those instruments similar to bonds. Such a modification of the Constitution must take place in a different forum. The proposed instruments in the instant case cannot be bonds because they lack the attributes of negotiability; therefore, the trial court properly determined that the provisions of § 222 were not applicable to the instruments in the instant case.
The appellants also contend that the transactions violate § 94 of the Constitution of Alabama, and that an election was required prior to the execution of the lease between the Park Board and the Barons. The resolution of this issue depends entirely upon facts admitted into evidence before the trial court. Our review of these assignments of error is limited by the ore tenus rule and the fact that the appellants have failed to include in the record on appeal a transcript of the testimony taken during the hearing.
Section 94 of the Constitution of Alabama prohibits a municipality from making a loan of credit, or a grant of money or thing of value in aid of an individual or a private corporation. There are two elements to a violation of the provisions of § 94: 1) the municipality must have performed *1300 one of the proscribed acts, and 2) the recipient must be an individual or a private corporation. The appellants would have us hold as a matter of law that the transaction in the instant case is a proscribed act solely because the stadium will be operated at a deficit. This we are not prepared to do, and the record on appeal will not allow us to determine that the trial court was palpably wrong or manifestly unjust in determining that the transactions "were not arbitrary or capricious, do not constitute unjust enrichment of the Baseball Club ... and do not impose an inequitable and unconscionable burden on the taxpayers and citizens of the City." The appellants' last contention is that trial court erred in ruling that no election was required for the approval and execution of the contracts for the lease of the stadium. As authority for their argument, the appellants rely upon Amendment No. 112 to the Constitution of Alabama, which requires voter approval before a political subdivision or public body may alienate certain public property. Again, the appellants would have us hold, as a matter of law, that a ten-year lease is equivalent to an alienation of the property. Again, this we are not prepared to do. We will not establish a time period that in and of itself equates a lease with an alienation of the property. This should be determined by the trial court on a case by case basis, and in the instant case the record on appeal will not allow us to determine that the trial court was palpably wrong or manifestly unjust in determining that there was no alienation of the property. See Winner v. Marion County Comm'n, 415 So.2d 1061 (Ala. 1982).
Based on the foregoing, we are of the opinion that the judgment of the trial court is due to be affirmed.
AFFIRMED.
MADDOX, JONES, BEATTY, ADAMS, HOUSTON and STEAGALL, JJ., concur.
TORBERT, C.J., and ALMON, J., dissent.
TORBERT, Chief Justice (dissenting).
The majority opinion concedes that the financial instruments in question have most of the attributes of bonds. However, it seems to conclude that they are not bonds, simply because they are non-negotiable under the law of commercial paper, and therefore are not within the operation of § 222, because § 222 refers only to bonds. Rather than blindly relying on the law of commercial paper to control whether the instrument in question is a "bond," as that word is used in § 222, I would look to the context in which the word was used and to the intent and purpose of § 222.
I must acknowledge, before I begin this inquiry, that there are statements in some cases that arguably support a narrow construction of § 222:
"It certainly cannot be affirmed that the purpose of the Constitution was to prohibit the creation of city indebtedness without an election. There is nothing in the Constitution to prohibit the creation of debts to the limit which it fixes, without the sanction of such election. The Constitution, § 222, only checks the issuance of a certain form of security for that debt, but not the creation of the debt. It has been held not to prohibit the issuance of warrants, under seal, though interest bearing and due over a period of years. Littlejohn v. Littlejohn, [195 Ala. 614, 71 So. 448]; Ramage, Parks & Co. v. Folmar, 219 Ala. 142, 121 So. 504."
Parsons v. City of Birmingham, 223 Ala. 610, 611, 137 So. 665, 666 (1931). However, neither Parsons nor Littlejohn v. Littlejohn, 195 Ala. 614, 71 So. 448 (1914), pays homage to an analysis based upon form over substance. In both cases, the court conducts an inquiry into the essential features of the instruments at issue before concluding that they do not fall within the operation of § 222.
Other cases make it clear that one of the key features bringing an instrument into the ambit of § 222 is that it create a general obligation, that is, one backed by the general tax revenues of the municipality. Opinion of the Justices No. 26, 226 Ala. *1301 570, 148 So. 111 (1933); Fuller v. City of Cullman, 240 Ala. 309, 199 So. 2 (1940); Opinion of the Justices No. 108. 252 Ala. 583, 42 So.2d 348 (1949). Fuller also emphasized the propriety of putting substance over form and looking to the purpose of the constitutional provision at issue:
"In deciding whether a given proposition is in violation of a constitutional limitation, such as here referred to, the result attempted to be brought about by what is proposed is the prime consideration, and the controlling test to it is to be found by regarding substance rather than form, in looking at its practical operation and effect when considered in the light of constitutional restrictions against improvident borrowing which the organic law obviously intended to impose in the premises. Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432."
Id., 240 Ala. at 314, 199 So. at 6.
Fuller and the two opinions of the Justices previously cited involved application of both § 222 and § 225. Those sections and § 104(17), preventing the legislature from passing a local law authorizing political subdivisions of the state to issue "bonds or other securities" without there first being an election, are obviously related. They were on occasion discussed together during the deliberations giving rise to the Constitution of 1901:
"I wish to take up the time of the Convention long enough to read a short item from a paper prepared by the Honorable Bird S. Coler, Comptroller of New York City, who is a high authority upon all questions pertaining to municipal indebtedness. He says:
"`I wish to state clearly my appreciation of, and adherence to, the wisdom of constitutional restrictions on the indebtedness of cities. These restrictions are to be found in the Constitutions of nearly all our states, and have been upheld both in letter and in spirit by the decisions of our courts. They have undoubtedly served to prevent the financial ruin of many small cities, which in the hands of unscrupulous political adventurers would otherwise have undergone disastrous experiences. Yet this constitutional limitation has itself its limitations. It should not be made a fetish to be worshipped blindly at the expense of really necessary progress.
"`[In] the competition which exists today between nations and cities, as well as between individuals, to stand still means to retrograde, and if it should happen that a choice must be made between stopping the modernization of New York and amending the Constitution, I am in favor of the latter course, provided no real danger to the city's credit and solvency be thereby threatened.
"`I believe the clause in the Constitution limiting municipal indebtedness wholly admirable at the time it was writtenis not altogether adapted to modern requirements, in that it does not discriminate sufficiently between two classes of city debts of a wholly different character.
"`A city issues bonds only for permanent improvements, the benefits of which inure to posterity. But there are two classes of these improvements, easily distinguishable from one another, and between which a sharp distinction should be drawn.
"`In one of these classes are improvements which, while adding to the attractiveness, beauty, and healthfulness of a city, to its economical administration, or to the better conduct of its governmental functions, bring in no direct financial returns. This is by the erection of public buildings, including schools, the acquisition of parks, and the repaving of streets. No matter how great the material benefits may be that are derived from such improvements, the expense incurred is unquestionably a financial burden upon the taxpayers. In regard to such expenditures there can be no doubt as to the wisdom of establishing an arbitrary constitutional limit, since otherwise the burdens that might be thrown upon succeeding generations by excessive issues of bonds would become intolerable.
"`There is another class of improvements, however, far less common, which *1302 either result in casting no burdens whatever upon the taxpayers or else bring in an actual profit to the municipality. In such cases it may be permissible to ask wherein there lies any rational excuse for limiting the governmental activities of a city by constitutional restrictions. A dim recognition of this truth seems already to have found expression in the Constitution of New York, which partially excepts from the operation of the debt limitation bonds issued to provide for the supply of waste and requires only that a special sinking fund be established for their ultimate redemption. Why this exception? Because pure water is a prime necessity for the health of a community? Scarcely, for there are many other public necessities paid for by the issue of bonds which are hardly less imperatively needed by the people, and as to such [the] Constitution is silent. The reason must be found in the fact that for the past century, by a universal custom which has the force of unquestioned law, it has been the practice of cities owning water-works to charge consumers for the water supplied, and that the rentals received from the operation of this natural monopoly have almost invariably shown a profit over the expense of maintenance and operation. In other words, bonds issued to provide for the supply of water are not a real burden upon the taxpayers, since the water rents received pay the interest on these bonds, amortize the principal, and still yield a profit to the city.'
"Summing up the result of this article, the author says:
"`Our constitutions should be amended so as to except from the limitation on the indebtedness of cities bonds issued to provide for improvementswhich, while governmental in their character are, nevertheless, essentially business enterprisesand from the operation of which profits can be derived sufficient to provide a speedy payment of the indebtedness temporarily incurred.'"
Official Proceedings, Constitutional Convention (Alabama), 1901 pp. 1513-15.
A spirited discussion followed, during which various limitations on indebtedness were discussed. At one point, Mr. Knox commented:
"There is another clause in the Article reported by the Committee on Municipal Corporations which restricts the issue of bonds, except by a vote of the city that makes it. That is a sufficient limitation, and we should not make an iron-clad rule that will hamper our cities in the future. I move the previous question."
Constitutional Proceedings at 1588. Eventually the present version of § 225, with different limitations on general debt and debt for water works, gas or electric plants, and sewage and street construction, emerged.
The Convention heard from the Committee on Local Legislation before it acted on the recommendations of the Committee on Municipal Corporations. The Committee, in a report that eventually led to § 104(17), proposed to restrict the legislature from passing laws authorizing local bond issues. It was noted: "[It would] be practically impossible to dispose advantageously of municipal bonds without the sanction of the General Assembly in each specific case.... We know that when we come to issue bonds, it is not only necessary to have authority to issue them, but it is necessary to have the authority to do so in such a manner as to make them attractive to investors." Constitutional Proceedings at 1853.
A view contrary to that of involving the legislature was expressed by Mr. Watts: "The object of the including of this provision in this report is not an account of the issue of bonds by any town or city, but simply to keep the legislature from taking the public time in passing a special law in each particular case." Constitutional Proceedings at 1855.
The remarks of several delegates on the proposal of the Committee on Local Legislation reflect the interplay between § 104(17), § 222, and § 225:
"MR. O'NEALOne of the greatest evils in Alabama has been the unlimited issue of bonds by the counties and municipalities of this State. If you take the *1303 record of the last few Legislatures you will find that over eight millions of indebtedness have been created. The result has been that the people of Alabama have demanded that the power of the Legislature to issue these bonds shall be curtailed. They have demanded that before any city or town in Alabama, or county, shall have the privilege of issuing bonds, that the question shall be submitted to a vote of that particular locality that may be affected. Then if a law of that kind is passed and it has been reported by the Committee on Municipal Corporations, a general law will be passed on the subject, requiring every city, county and town in Alabama before they issue a bond, to submit the question to a vote of the people [of] the particular locality that will be affected.
"The Legislature will pass a law prescribing the terms in the bonds. They can provide that the rate of interest at which the bonds shall be issued, shall be determined by an ordinance of the particular town or city affected. They can provide that when the bond issue is authorized, that fact can be certified to the Secretary of State by the Mayor or Probate Judge, and what more evidence would a bond buyer want than that certificate? You have that certificate to show the election of a Governor. You have it to show the election of every official in this State, and why should we go to the bondholder or to the bond-buyer with more evidence than we give upon the election of the most important officials in this State?
"Now I say if you strike out this provision you leave it in the power of the Legislature to authorize the issuance of bonds, in any town, city or county in the State, absolutely without restriction or limitation. You allow the local member to come to Montgomery without consulting his constituents, without seeking to know their wishes in regard to the issuance of bonds, he secures the issuance of bonds in any amount that may suit his pleasure and the people are without remedy.
"MR LONG. (Walker)Is it not a fact that a limitation was placed upon the power of counties and municipalities to issue bonds in one of the other reports?
"MR. O'NEALIt is not a fact, as I understand it. There was nothing in the report of the Committee on Taxation on this subject which has ever been adopted by this Convention. There is only a limitation in the report of the Committee on Taxation that no city or town shall exceed 7 per cent of the assessed value of its property and there is a limitation upon the rate of taxation, but there has been no limitation upon the power otherwise.
"MR. BOONEI read to you from the report of the Committee on Municipal Corporations:
"`Sec. 7. No county, city, town, village, district or other political subdivision of a county shall have authority or be authorized by the General Assembly after the ratification of this Constitution to issue bonds, unless such issue of bonds shall have first been approved by majority vote by ballot of the qualified voters of such county, city, town, village, district, or other political sub-division of a county voting upon such proposition. In determining the result of any election held for this purpose, no vote shall be counted as an affirmative vote which does not show on its face that such vote was cast in approval of such issue of bonds.'"
Constitutional Proceedings at 1857-58.
By the time the Convention actually took up § 7 of the report of the Committee on Municipal Corporations, most of the discussion centered on whether female property owners should be able to vote in bond elections.
I cite the lengthy discussions from the constitutional proceedings not to affirmatively show what the framers intended by using the word "bonds" in § 222 but rather to show that the framers did not discuss what was to be included within the term "bonds." It is interesting to note that the Constitution both affirmatively authorizes the issuance of bonds upon the vote of the *1304 people of the municipality in § 222 and prohibits the legislature from passing local laws authorizing the issuance of "bonds or other securities" without an election by the voters in the municipality, § 104(17).
Because I find no hint in these discussions that the word "bond" was used as the result of a deliberate attempt to restrict the issuance of only an instrument that has the strict technical requirements of a bond, it is appropriate to examine the question of whether the lack of negotiability, the element the majority concludes is fatally lacking, should remove the instruments involved in the present case from the requirements of § 222.
I have difficulty in following the rationale of the majority with respect to negotiability and the "holder in due course" issue. First, while these instruments may not be technically negotiable, they are freely transferable and assignable, although transfer or assignment is accomplished only upon surrender to the depository for cancellation and the reissuance of a new instrument of like tenor. The majority concludes that the transferee cannot be a holder in due course and, therefore, would be subject to all defenses of the obligor. However, the ordinance, as well as the instrument itself, provides that the indebtedness "is lawfully due without condition, abatement or offset of any description."
The mandate of a constitutional provision should not be so easily circumvented by a technical statutory requirement that has no practical effect in this setting. Holder-in-due-course status has a significant effect where the subsequent holder is protected from defenses of the original obligor. In the instant case, there are no defenses that could be asserted against a subsequent holder that could not be asserted against a holder in due course. In other words, a subsequent holder's position would be no better, even if he had holder-in-due-course status.
Therefore, I conclude that § 222 required that an election be held before these instruments could be issued.
Although I believe the instruments at issue are subject to the requirements of § 222, I would apply this decision quasi-prospectively. The Alabama Bankers Association and the Alabama Security Dealers Association, in an amicus curiae brief, contend:
"The retroactive application of a decision invalidating the Hoover Warrants could cast doubt on the validity of all warrants issued prior to the entry of the decision in this case (the "Prior Warrants") and could deprive innocent warrant holders of vested rights, create great confusion among Alabama local governments, increase the cost to Alabama local governments of borrowing money and generate additional litigation. Moreover, retroactive application of this decision would not advance or uphold any of the purposes of the electoral requirements of Section 222. Thus, any holding which might affect the validity of Prior Warrants should not be applied retroactively."
In Stallworth v. Hicks, 434 So.2d 229 (Ala.1983), we refused to apply retroactively a prior decision that changed the law of homestead to meet a constitutional challenge. In doing so, we cited with approval Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 374, 60 S.Ct. 317, 318-19, 84 L.Ed. 329 (1940):
"The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. Norton v. Shelby County, 118 U.S. 425, 442 [6 S.Ct. 1121, 1125, 30 L.Ed. 178]; Chicago, I. & L. Ry. Co. v. Hackett, 228 U.S. 559, 566 [33 S.Ct. 581, 584, 57 L.Ed. 966]. It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of *1305 the subsequent ruling as to invalidity may have to be considered in various aspects,with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified."
I believe that consideration of the factors set forth above lead to the conclusion that my position on the requirements of § 222, if it had prevailed, should not be applied retroactively. See State ex rel. Washington State Finance Committee v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963), wherein the Washington Supreme Court refused to retroactively apply a decision holding that limited obligation bonds were subject to a constitutional debt limit.
As previously stated, however, I would apply the decision quasi-prospectively.
"Quasi-prospective overruling, like prospectivity, protects reliance on prior rules by applying the overruling decision to acts done or transactions consummated after the effective date of the decision. Unlike prospective overruling, however, when a court overrules quasi-prospectively, it affords relief to the instant parties. The major justifications for using quasi-prospective overruling are two-fold: first, to make an announcement binding precedent rather than mere dictum; and second, to reward successful appellants and thereby provide an incentive for litigants to challenge existing rules of law that are in need of reform."
33 Ala.L.Rev. 463, 473 (1982). This case was brought pursuant to Code 1975, § 6-6-750 et seq., which set up a mechanism for establishing, before issuance, the validity of a proposed obligation. While the result of my position might have, if it had been the majority position, caused the municipality some inconvenience, because the obligation has not yet been issued the reliance factor is insignificant in comparison to the purposes to be served by § 222.
ALMON, J., concurs.